IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO


GLENDA L. WASHINGTON,              )        CASE NO. 3:13-cv-01741
                                  )
            Plaintiff,            )        MAGISTRATE JUDGE
                                  )        KATHLEEN B. BURKE
        v.                       )
                                  )
COMMISSIONER OF SOCIAL            )
SECURITY ADMINISTRATION,          )
                                  )        **MEMORANDUM OPINION & ORDER**
            Defendant.           )


Plaintiff Glenda L. Washington ("Plaintiff" or "Washington") seeks judicial review of the

final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her application for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 17.   Because the Administrative Law Judge's

("ALJ"), explanation for the weight provided to the medical opinions rendered with respect to

Washington's mental health impairments, including the opinion of her treating psychologist Dr.

Jennifer B. Smirnoff, does not allow this Court to conduct a meaningful review of the

Commissioner's decision, the Court is unable to conclude that the Commissioner's decision is

supported by substantial evidence.  Accordingly, the Court **REVERSES AND REMANDS** the

final decision of the Commissioner for further proceedings consistent with this Opinion and

Order.

## I.  Procedural History

Washington filed an application for Supplemental Security Income ("SSI")[1] on February 18, 2010.[2]  Tr. 13, 52-53, 167-170.  She alleged a disability onset date of February 15, 2007 (Tr. 167), and claimed disability due to diabetic neuropathy, fibromyalgia, and depression (Tr. 58, 67, 181).  After initial denial by the state agency (Tr. 52, 58), and denial upon reconsideration (Tr. 53, 67), Washington requested a hearing (Tr. 75).  On October 21, 2011, Administrative Law Judge Paul Coulter ("ALJ") conducted a hearing.  Tr. 32-51.

In his February 13, 2012, decision (Tr. 10-31), the ALJ determined that Washington had not been under a disability since February 18, 2010, the date the application was filed (Tr. 13, 25).  Washington requested review of the ALJ's decision by the Appeals Council.  Tr. 8-9.  On June 12, 2013, the Appeals Council denied Washington's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.  Personal, educational and vocational evidence

Washington was born in 1966.  Tr. 35, 167.  At the time of the hearing, Washington's three children were ages 16, 21, and 23.  Tr. 35, 746.  She was living in a house with her partner, 16 year old son, and her partner's children.  Tr. 35.  She completed 12th grade and is able to read and write in English.  Tr. 36.  Washington last worked in 2006 or 2007 at U-Haul.  Tr. 36.  She served in the Army and received a general discharge under honorable conditions.  Tr. 746.

---

[1] The record also appears to contain an application for Disability Insurance Benefits ("DIB").  Tr. 54-57.  However, neither the ALJ nor the parties reference or discuss a separate DIB application.

[2] Washington notes in her brief that she previously applied for SSI in 2007.  Doc. 15, p. 2, n. 1.  Her application was denied at the initial level and she did not appeal the denial.  Doc. 15, p. 2, n. 1; Tr. 190.

**B.  Medical evidence**

**1.  Mental impairments**

**a.  Treatment history**

In February 2008, Washington saw Dr. Kristen E. Gennari, M.D., to establish a new
doctor-patient relationship.  Tr. 300.  Washington reported having severe depression for which
she was taking Cymbalta.[3]  Tr. 300.  During later visits with Dr. Gennari in 2008, Washington
was frustrated and overwhelmed and was prescribed anti-depressants to help with her mood.  Tr.
294, 295.

During a January 2009, visit, Washington reported anger issues but denied anxiety or
depression.  Tr. 293.  Dr. Gennari recommended that Washington see a psychiatrist but
Washington was not interested.  Tr. 293.  Dr. Gennari nonetheless provided Washington with
information on Harbor Behavioral to contact when she was ready.  Tr. 293.  During a March
2009, visit, among other matters, Washington continued to complain of being depressed.  Tr.
290.  She reported that there were days that she did not want to get out of bed, but many times it
was secondary to pain.  Tr. 290.  Dr. Gennari increased Washington's Cymbalta to see if it
would help with Washington's depression as well as her neuropathy.  Tr. 290.  During an April
2009, visit, Washington continued to complain of her depression noting that it was "definitely an
issue with all the pain that she . . . [was] experiencing."  Tr. 289.  In July 2009, Washington
reported to Dr. Gennari that she was continuing to struggle with her mood and depression.  Tr.
286.  She was taking Wellbutrin and was interested in increasing the dose.  Tr. 286.  Dr. Gennari
increased Washington's Wellbutrin but noted that she did not think it would completely resolve

---

[3] Washington also reported other health issues, including that she was an insulin-dependent diabetic and had
neuropathy from her diabetes.  Tr. 300.  Washington's physical impairments are discussed in further detail below.

Washington's issues.  Tr. 286.  Dr. Gennari also noted that she had urged Washington to see a psychiatrist but Washington refused again.  Tr. 286.

During a February 2010, visit with Dr. Gennari, Washington continued to complain of extensive depression due to her pain.  Tr. 282.  Dr. Gennari noted that pain management had scheduled Washington for an evaluation at Harbor.  Tr. 282.  On April 13, 2010, Washington saw clinical psychologist Diane M. Derr, Ph.D., of Stress Care Behavioral Health.[4]  Tr. 408-411. It is unclear whether Washington continued to be treated by Dr. Derr.

On April 28, 2011, Washington was seen by psychologist Dr. Jennifer Smirnoff, Ph.D., PCC, of the The University of Toledo Medical Center for an outpatient psychiatric evaluation. Tr. 740-749.  Washington reported that her primary care physician had referred her for therapy for "severe depression."  Tr. 740.  Washington indicated that she had been severely depressed for the past year and reported that her depression started as her physical limitations increased due to complications with her diabetes that impaired her ability to work and provide for her family.  Tr. 740, 748.  Washington reported that her primary care physician, Dr. Melissa Harris, had diagnosed her with depression and had prescribed Xanax, Cymbalta, and Wellbutrin.[5]  Tr. 742, 743.  Washington reported some improvement in her mood since starting anti-depressants.  Tr. 748.  Additionally, Washington reported taking other medications, including Percocet and Lantus, as prescribed by Dr. Harris. Tr. 744.  During the evaluation, Washington was depressed but cooperative.  Tr. 746-747.  Her affect was full.  Tr. 747.  Her speech was normal/clear.  Tr. 747.  There were no reported perceptual disorders and her thought content was intact.  Tr. 747. Washington did not exhibit homicidal or suicidal intent or plan.  Tr. 747.  Her thought process

---

[4] As discussed further below in the medical opinion section, on April 23, 2010, Dr. Derr responded to an Agency questionnaire regarding Washington's mental impairments.  Tr. 409-411.

[5] On June 28, 2010, Washington saw Dr. Melissa Harris-Martorana, M.D., at Woodley Park Internal Medicine to establish a new doctor-patient relationship.  Tr. 504.

was goal directed.  Tr. 747.  Washington's memory, judgment and insight were intact.  Tr. 748.

She was of average intelligence.  Tr. 748.  Dr. Smirnoff diagnosed Washington with major

depressive disorder, single episode, severe without psychotic features, and she assessed a GAF

score of 50.[6]  Tr. 749.  Dr. Smirnoff's recommendations included continuing care with her

primary care physician, following her primary care physician's recommendations and beginning

CBT to decrease her depression.[7]  Tr. 749.

    Shortly thereafter, on May 7, 2011, Washington was admitted to the psychiatric unit of

The Toledo Hospital after a suicide attempt.  Tr.  613-620, 649-707.  Washington attempted to

overdose on Percocet and Alprazolam.  Tr. 613.  Washington reported that she had been fighting

with her mother and daughter over finances and was having increased problems and conflicts at

home.  Tr. 613.  When Washington was admitted she was diagnosed with major depressive

episode, recurrent, moderate to severe with suicide attempt by drug overdose and posttraumatic

stress disorder.  Tr. 611.  She was assessed a GAF score of 35.[8]  Tr. 661.  On May 13, 2011,

Washington was discharged with diagnoses of major depressive episode, recurrent, moderate-to-

severe with suicidal ideation and posttraumatic stress disorder, chronic.  Tr. 649.  She was

prescribed medication, including Klonopin and Risperdal.  Tr. 649.  Upon discharge, she was

---

[6] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*

[7] The treatment notes do not define CBT.  However, there is an indication in the treatment notes that Washington expressed an interest in psychotherapy services through the Department of Psychiatry.  Tr. 748.  Thus, CBT may refer to cognitive behavioral therapy.

[8] A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  *Id.*

maintaining control and willing to follow up with outpatient treatment as well as treatment through her primary care physician and Dr. Smirnoff.  Tr. 615, 649.

Washington was seen for a follow-up evaluation on May 19, 2011, at The University of Toledo Medical Center by Dr. Puneet Singla, M.D., Psychiatric Resident.[9]  Tr. 727-739.  Dr. Singla's diagnoses included major depressive disorder, recurrent, severe with psychotic features; dysthymic disorder; trichotillomania;[10] and rule out posttraumatic stress disorder.  Tr. 737.  A GAF score of 55 was assessed.[11]  Tr. 737.  Dr. Singla noted that Washington was taking Cymbalta, Risperdal at bedtime, and Klonopin.  Tr. 738.  Washington reported that she had noticed some improvement since starting the medication and she planned to continue with the medication.  Tr. 738.  Washington requested additional medication to help her sleep and Dr. Singla discussed adding Trazadone at bedtime.  Tr. 738.  Dr. Singla advised Washington that Xanax could not be prescribed because of her recent history of overdose.  Tr. 738.  Dr. Singla also explained that Klonopin could cause memory problems and be potentially lethal if taken in very high amounts.  Tr. 738.  Dr. Singla discussed a crisis plan with Washington and she indicated that she understood and agreed to adhere to the plan.  Tr. 738.  Also, Washington indicated that she intended to continue therapy with Dr. Smirnoff.  Tr. 738.

On May 31, 2011, Washington saw Dr. Smirnoff.  Tr. 734-724.  Washington discussed her recent suicide attempt with Dr. Smirnoff.  Tr. 723-724.  They reviewed Washington's crisis

---

[9] Supervisor Dr. Kristi Skeel Williams, M.D., countersigned Dr. Singla's evaluation of Washington.  Tr. 739. Washington was also seen for follow up care by her primary care physician Dr. Melissa Harris-Martorana on May 23, 2011.  Tr. 708.

[10] Trichotillomania is "compulsive pulling out of one's hair, associated with tension or an irresistible urge before pulling and followed by pleasure or relief."  *See* Dorland's Illustrated Medical Dictionary, 31st Edition, 2007, at 1991.  Washington reported that she twists her hair and sometimes pulls it out because it relieves her anxiety.  Tr. 729.

[11] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

plan.  Tr. 723.  On mental status examination, Washington was depressed.  Tr. 723.  She had no suicidal or homicidal ideation; her affect was appropriate to content; she had no perceptual disorders; her thought content, though process, memory, and orientation x3 were intact.  Tr. 721-722.  Noting Washington's recent suicide attempt since their last session, Dr. Smirnoff's overall assessment of Washington's progress was that Washington was "somewhat worse."  Tr. 724.  Dr. Smirnoff recommended that Washington continue with therapy.  Tr. 724.

On June 3, 2011, Washington saw Dr. Smirnoff.  Tr. 721-722.  Washington reported lying on the couch and watching television daily.  Tr. 721.  She was trying to do one or two household tasks each day.  Tr. 721.  She felt joy at times during a family reunion in Virginia.  Tr. 721.  On mental status examination, Washington was depressed.  Tr. 721.  She had no suicidal or homicidal ideation; her affect was appropriate to content; her speech was normal; she had no perceptual disorders; her thought content, though process, memory, and orientation x3 were intact.  Tr. 721-722.  Noting that Washington denied suicidal ideation and identified ways to work on improving her mood daily, Dr. Smirnoff's overall assessment of Washington's progress was that Washington had "some improvement."  Tr. 724.  Dr. Smirnoff recommended that Washington continue with therapy.  Tr. 722.

On June 23, 2011, Washington saw Dr. Smirnoff.  Tr. 719-720.  Washington reported that she had been diagnosed with sleep apnea and restless leg syndrome.  Tr. 719.  She also indicated that she had been moody and snapping at people.  Tr. 719.  Dr. Smirnoff explored the thoughts underlying Washington's irritability but Washington was not sure of the reason.  Tr. 719.  On mental status examination, Washington was depressed.  Tr. 719.  She had no suicidal or homicidal ideation; her affect was appropriate to content; her speech was normal; she had no perceptual disorders; her thought content, though process, memory, and orientation x3 were

intact.  Tr. 719-720.  Noting that Washington would need to "explore possible thought distortions," Dr. Smirnoff's overall assessment of Washington's progress was that Washington had "some improvement." Tr. 720.  Dr. Smirnoff recommended that Washington continue with therapy.  Tr. 720.

On July 6, 2011, Washington was seen by psychiatrist Dr. Singh at The University of Toledo Medical Center for follow up.[12]  Tr. 717-718.   Washington reported an improved mood; improved sleep; and improved auditory hallucinations.  Tr. 717.  She noted that, while she was not depressed, her family members had noted that she was angrier.  Tr. 717.  She relayed that she had been diagnosed with sleep apnea and was using a CPAP machine at night and she had been diagnosed with restless leg syndrome for which she was taking medication.  Tr. 717.  She reported that she had been following an 1800 calorie diet which had helped her lose weight.  Tr. 717.  Washington denied medication side-effects.  Tr. 717.  However, she reported that she was restless and fidgety, which was impacting her ability to concentrate and finish tasks.  Tr. 717.  She reported that she was continuing to pull her hair when she was anxious.  Tr. 717.  She reported that that the voice of her mother that she had been hearing had decreased in intensity and frequency.  Tr. 717.  On mental status examination, Washington's mood was noted as euthymic, with an additional notation that she was "ok."  Tr. 717.  She had no suicidal or homicidal ideation; her affect was appropriate to content; her speech was normal; she had no perceptual disorders; her thought content, thought process, memory, and orientation x3 were intact.  Tr. 717-718.  Noting that Washington's mood and sleep were better and her auditory hallucinations were less intense and less frequent, Dr. Singh's overall assessment of Washington's progress was that Washington had "some improvement." Tr. 718.  Dr. Singh

---

[12] The Psychiatric Progress Notes reflect that Dr. Singh (first name not legible) saw Washington and a supervisor (name not legible) countersigned the progress notes.  Tr. 717-718.

decreased Washington's Risperdal and continued her on Cymbalta, Klonopin, and Trazadone. Tr. 718.

On July 21, 2011, Washington saw Dr. Smirnoff again.  Tr. 715-716.  Washington reported that she was irritable and angry.  Tr. 715.  She was crying for no reason and her partner was frustrated with her mood.  Tr. 715.  Dr. Smirnoff explored possible triggers for her irritability, and Washington indicated that, other than pain, there were no particular triggers.  Tr. 715.  However, she noted that sometimes she and her partner have differences with respect to parenting.  Tr. 715.  Washington indicated that she recognized the power of cognitive restructuring and she noted that she had been attending church for support and encouragement. Tr. 715.  On mental status examination, Washington was depressed.  Tr. 716.  Her affect was appropriate to content; her speech was normal; she had no perceptual disorders; her thought content, thought process, memory, and orientation x3 were intact.  Tr. 715-716.  Noting that Washington's mood was still depressed, Dr. Smirnoff's overall assessment of Washington's progress was that there had been "no change."  Tr. 716.  Dr. Smirnoff recommended that Washington continue with therapy.  Tr. 716.

### b.  Opinion evidence

*Treating psychologists*

*Jennifer Smirnoff, Ph.D., PCC.*

On October 20, 2011, Dr. Smirnoff completed a form titled "Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairments."  Tr. 755-757.   She opined that Washington was able to remember, understand and follow directions and maintain attention and concentration for two-hour periods of time for at least 80% of the time.  Tr. 755.

With respect to Washington's ability to perform work at a reasonable pace, Dr. Smirnoff noted that Washington's depression was causing decreased energy and motivation and opined that Washington's symptoms impaired her pace severely; she should not have any fast or externally imposed pace; and she would be more than 25% less productive than an unimpaired worker.  Tr. 756.

With respect to Washington's ability to keep a regular work schedule and maintain punctual attendance, Dr. Smirnoff noted that Washington attends both counseling and medication management appointments and opined that, because of psychiatric-based symptoms, Washington would be absent, late or leave early 1-3 times per month.  Tr. 756.

Dr. Smirnoff noted that Washington showed appropriate social skills but was clearly depressed as evidenced by her facial expressions and body language and opined that Washington could tolerate only occasional (up to 1/3 of the workday) superficial interactions with co-workers or the public.  Tr. 756.

Dr. Smirnoff noted that, because of Washington's depression, it was expected that she would become easily overwhelmed and/or miss work altogether; she withdraws into her home, and opined that Washington would have difficulty tolerating the stress of routine, unskilled or low-skilled work, and would require frequent absences or breaks interfering with work productivity.  Tr. 757.

Dr. Smirnoff also opined that Washington's depression was significant at the time and the limitations noted lasted or were expected to last at least 12 months.  Tr. 757.

_Diane M. Derr, Ph.D._

After having seen Washington once, clinical psychologist Diane M. Derr, Ph.D., completed a questionnaire regarding Washington's mental impairments.  Tr. 409-411.  She

indicated that Washington was "depressed, easy to tears, some suicidal ideation without coherent plan or intent."  Tr. 409.  Dr. Derr indicated that Washington's "frustration tolerance [was] reduced."  Tr. 410.  Washington's activities of daily living were limited by pain, not depression, with some restriction of pleasurable activities.  Tr. 410.  Dr. Derr noted that Washington complained of having depression for at least two years.  Tr. 410.  Dr. Derr indicated that Washington was not compliant with medication/appointments, noting that Washington had missed her first appointment for no good reason.  Tr. 411.  She opined that Washington's ability to tolerate stress was poor and her diagnosis was depression NOS.  Tr. 411.

*Consultative examining psychologists*

*Mark D. Hammerly, Ph.D.*

On April 21, 2010, psychologist Dr. Mark D. Hammerly, Ph.D., conducted a consultative examination.  Tr. 398-405.  Washington reported that she suffered from diabetic neuropathy and fibromyalgia and had been on psychiatric medication for about a year and a half.  Tr. 399.  She had just recently started counseling.  Tr. 399.  Washington also reported that she had last worked six years ago at U-Haul but quit because she was real depressed and could not take it any longer.  Tr. 400.  Washington was crying during the interview and Dr. Hammerly noted that it was difficult to get her to stop crying.  Tr. 402.  Dr. Hammerly's diagnoses included major depression, single episode, moderate.  Tr. 404.  He assessed a GAF score of 51.  Tr. 404.  With respect to the four-work related mental abilities, Dr. Hammerly opined that:

1.  The claimant's mental ability to relate to others, including fellow workers and supervisors is moderately impaired.  The claimant related poorly today, as she was depressed to the point that it adversely affected the interview.  She also describes moderate deficits in interpersonal functioning, such as, e.g. 'few friends.'

2.  The claimant's mental ability to understand, remember, and follow instructions is not impaired.  She is capable of comprehending and completing

11

simple, routine ADL tasks both at home and in the community.  She showed no grossly apparent comprehension or memory problems during the psychological assessment (e.g. misunderstanding the examiner, forgetting important dates or details of her life, etc.).

3.  The claimant's ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks is mildly impaired.  Precise impairment in this area is largely unable to be determined since further information is necessary (e.g. valid test scores, & etc.); however, she would not have scored in the 'average' range on FSIQ measures, based on estimates derived from this MSE.

4.  The claimant's mental ability to withstand the stress and pressures associated with day-to-day work activity is moderately impaired.  This impairment is due to Major Depression, Single Episode, moderate.

Tr. 404-405.[13]

*State agency reviewing psychologists*

*Steven J. Meyer, Ph.D.*

On April 28, 2010, Steven J. Meyer, Ph.D., completed a Psychiatric Review Technique (Tr. 420-433) and a Mental RFC (Tr. 434-437).  Dr. Meyer opined that Washington had mild restrictions in activities of daily living and moderate difficulties in maintaining social functioning and maintaining concentration, persistence or pace.  Tr. 430.  There were no episodes of decompensation, each of extended duration.  Tr. 430.  He further opined that Washington was "[c]apable of simple and moderately complex routine work, in setting with regular expectations, occasional intermittent interactions with others and few changes."  Tr. 436.  In rendering his opinion, Dr. Meyer gave weight to the consultative examiner's opinion "with consideration given

---

[13] Also, on September 18, 2007, presumably as part of Washington's 2007 SSI application, psychologist Roger H. Avery, Ed.S., conducted a consultative evaluation.  Tr. 245-249.  Washington reported that she had last worked at U-Haul in 2003 and had to stop working because of her neuropathy.  Tr. 246.  Avery's diagnoses included major depressive disorder, recurrent, moderate; pain disorder associated with both psychological factors and a general medical condition, chronic; relational problem NOS; and personality disorder NOS.  Tr. 248.  He opined that Washington's mental ability to relate to others, including fellow workers and supervisors, was moderately impaired based on her depression; her ability to understand, remember and follow instructions was moderately impaired based on her borderline range of intellectual functioning; her ability to withstand the stress and pressure associated with day-to-day activities was mildly to moderately impaired; she was able to perform her activities of daily living; and she had the ability to perform at least simple, repetitive tasks.  Tr. 248.  He assessed a GAF score of 50-55.  Tr. 248.

to the consistency of this information with the prior CE, current PCP office visit notes, no treatment or in-patient hospitalization."

*Kristen Haskins, Psy. D.*

On September 23, 2010, state reviewing psychologist Kristen Haskins, Psy.D., reviewed the record and affirmed Dr. Meyer's April 28, 2010, Psychiatric Review Technique and Mental RFC as written. Tr. 505. She noted that there had been no change or worsening and there was no further psychiatric treatment reported. Tr. 505.

**2. Physical impairments**

**a. Treatment history**

As noted above, Washington began treatment in February 2008 with primary care physician Dr. Gennari. Tr. 300. Washington was an insulin-dependent diabetic with neuropathy from her diabetes. Tr. 300. Also, as noted above, she complained of a history of depression. Tr. 300. She was not checking her blood sugars. Tr. 300. She was taking Lantus, Lyrica, and Cymbalta. Tr. 300. During a May 2008, visit with Dr. Gennari, Washington complained of left shoulder pain. Tr. 299. Washington was in physical therapy with improvement in her right shoulder but no improvement in her left shoulder. Tr. 299. Her fasting blood sugars were at better levels than they had been but Dr. Gennari adjusted the medication to try to get Washington's blood sugars where Dr. Gennari wanted them to be. Tr. 299. Washington was continuing to have problems with her neuropathy; she reported a burning sensation in her legs. Tr. 299. Dr. Gennari adjusted Washington's Lyrica to try to help with the neuropathy. Tr. 299. In September 2008, Washington continued to complain of multiple aches and pains due to her neuropathy. Tr. 295. Dr. Gennari stressed to Washington that, if they got her blood sugars under

better control, other aspects of Washington's health would improve, including her energy level and neuropathies.  Tr. 295.

Washington continued to see Dr. Gennari throughout 2009, with continuing complaints of pain and indications that, at times, Washington was not checking her blood sugars and/or that her blood sugars were high when she experienced other health issues.  Tr. 283, 286, 287, 290, 292, 293.  On April 27, 2009, Washington was admitted to The Toledo Hospital for intractable muscle pain and spasm.  Tr. 353.  Washington had been on Lyrica and Cymbalta for her depression but there was concern that the Lyrica was causing Washington's pain so she was taken off the Lyrica and she had a worsening of her pain with spasms.  Tr. 353.  Consults were made to rheumatology and neurology.  Tr. 353.  Rheumatology indicated that it was highly doubtful that Washington had any inflammatory myopathies so an EMG was performed.  Tr. 353.  The EMG showed mixed motor and sensory neuropathy without radiculopathy, myopathy, or myositis.  Tr. 354, 381-382.  Neurology's recommendation was to increase Washington's Lyrica and use amitriptyline at night for better control of her pain.  Tr. 353.  Washington did not show significant improvement while admitted but her pain was well controlled with the addition of the Lyrica and amitriptyline and morphine.  Tr. 353.  While she was admitted, Washington underwent a right quadriceps muscle biopsy.  Tr. 353.  She was discharged on April 30, 2009, with a prescription for outpatient physical therapy and aqua therapy and with instructions for a follow-up visit.[14]  Tr. 354.

Because of reports of shoulder pain, on September 22, 2009, an MRI was taken which revealed moderate acromioclavicular joint degenerative changes.  Tr. 283, 478.  On September

---

[14] She was seen at the emergency room on May 30, 2009, complaining of an infection on her right thigh where she had her biopsy.  Tr. 347-349.  As of July 1, 2009, her thigh wounds had completely healed.  Tr. 286.

28, 2009, Washington was continuing to report problems with her right shoulder and was interested in getting into therapy before seeing an orthopedic doctor.  Tr. 283.

On January 28, 2010, Washington was seen by Howard Black, M.D., of Toledo Pain Services.  Tr. 259.  Her chief complaints were muscle pain, generalized muscle fatigue and headache.  Tr. 259-264.  On physical examination, Washington's range of motion, mobility, muscle strength, sensation and deep tendon reflexes were normal.  Tr. 261-262.  Dr. Black diagnosed Washington with unspecified myalgia and myositis and polyneuropathy in diabetes. Tr. 262.  He recommended that Washington continue with the Percocet as prescribed by her primary care physician and he added Savella and Neurontin.  Tr. 262.  He also recommended that she start physical therapy.  Tr. 262.  On February 8, 2010, Washington saw Dr. Black again and reported generalized overall body pain.  Tr. 255-258.  She stated she had fibromyalgia.  Tr. 255.  Her pain varied with sharp/burning pain and pins/needles at times.  Tr. 255.  Washington reported that she had an appointment with a rheumatologist on February 22, 2010.  Tr. 255.  She was involved in physical therapy but not sure it was helping.  Tr. 255.  On physical examination, Washington showed mild generalized tenderness in the lumbar area but normal strength and tone.  Tr. 256.  Dr. Black advised Washington to discontinue the medication previously prescribed by his facility but to continue medications as prescribed by her primary care physician.  Tr. 257.  It was recommended that Washington continue with physical therapy and she was to follow up with rheumatology.  Tr. 258.

On February 24, 2010, Washington reported to Dr. Gennari that she had seen a rheumatologist and was diagnosed with fibromyalgia.  Tr. 282.  Washington also reported that her rheumatologist stated that Washington was on all of the medication that she would recommend for fibromyalgia.  Tr. 282.  Dr. Gennari indicated that Washington had exquisite

15

tenderness over the right trochanteric bursa and pain with external rotation of the hip, but none

significantly with flexion or internal rotation.  Tr. 282.  Her left hip showed some pain with

external rotation but otherwise the exam was normal.  Tr. 282.  Dr. Gennari administered an

injection into Washington's right trochanteric bursa and, prescribed OxyContin and Percocet.

Tr. 282.  A February 24, 2010, bilateral hip x-ray showed no fracture or destructive lesion.  Tr.

452.

      Beginning in March 2010 through August 2010, Washington saw Oscar Linares, M.D.,

for pain management.  Tr. 438-490.  On March 15, 2010, Dr. Linares ordered a bone scan and

noted diagnoses of chronic neuropathy and fibromyalgia. Tr. 490.  An April 2010 bone scan

showed "mildly increased uptake within the knees suggesting osteoarthritis." Tr. 451.  As of

August 2010, Washington was still reporting pain but the pain medication was helping.  Tr. 444.

      As noted earlier, on June 28, 2010, Washington saw Dr. Harris-Martorana to establish a

new doctor-patient relationship.  Tr. 504.  She had recently been hospitalized for right sided

abdominal pain.  Tr. 504, 546-547.  Initially it was thought that Washington had a kidney stone

but she was ultimately diagnosed with gastroparesis due to poorly controlled diabetes.  Tr. 504,

546-547.  Dr. Harris-Martorana's impressions were uncontrolled diabetes with neuropathy,

fibromyalgia, increased blood pressure and a skin rash.  Tr. 504.  Dr. Harris-Martorana's

September 7, 2010, office notes reflect that the fibromyalgia diagnosis was per Dr. Linares.  Tr.

502.

      On November 14, 2010, Washington was seen again at the emergency room.  Tr. 525-

526.  She complained of left abdominal flank pain that had been present for a month.  Tr. 525.

She was diagnosed with back pain and muscle spasm.  Tr. 526.  She was prescribed Flexeril,

Naprosyn and Vicodin.  Tr. 526.  Washington was back at the emergency room on November 16,

2010, and was diagnosed with rib sprain. Tr. 517-519. She was advised to stop the Flexeril and follow up with her primary care physician. Tr. 519. On November 19, 2010, she was seen by her physician Dr. Harris-Martorana with complaints of stomach flu and vomiting. Tr. 713. A few days later, she was in the emergency room with complaints of nausea, vomiting and increased pain attributed to gastroparesis. Tr. 625, 630, 631.

On April 4, 2011, she saw her primary care physician for neuropathy in her arms and legs. Tr. 709. A sleep study was recommended and she was referred to a pain management specialist. Tr. 709. She was prescribed Percocet and Xanax. Tr. 709. Concern was raised when April 6, 2011, lab results did not show any narcotics. Tr. 710. Also, it was noted that a referral to an endocrinologist was in order because of abnormal hemoglobin results. Tr. 710.

On April 13, 2011, Washington was seen at the Toledo Pain Services by Dr. Black. Tr. 750-754. Dr. Black noted that Washington had not changed much since having been seen the prior year. Tr. 750. On physical examination, Washington showed mild generalized tenderness in the lumbar area. Tr. 752. Her stability, strength and tone were normal. Tr. 752. Dr. Black assessed polyneuropathy in diabetes and unspecified myalgia and myositis. Tr. 753. He referred her for an MRI of her lumbosacral spine and to Stresscare for pain management. Tr. 753.

On May 23, 2011, Washington saw Dr. Harris-Martorana for a follow up appointment after she had been hospitalized for a suicide attempt. Tr. 708. Washington was not going to pain management. Tr. 708. Washington reported sharp leg pain. Tr. 708. Dr. Harris-Martorana's diagnoses included diabetes and leg pain. Tr. 708.

On July 19, 2011, Washington had x-rays taken for low back and hip pain. Tr. 644-647. The spine x-ray showed "stable mild degenerative disc disease and lower lumbar spine facet

degenerative change."  Tr. 644.   The hip and pelvis x-ray showed "stable, unremarkable

radiographs of the pelvis and hips."  Tr. 647.

An August 26, 2011, a sleep study showed obstructive sleep apnea and periodic limb

movement disorder.  Tr. 642-643.  It was recommended that Washington continue with the

CPAP machine and lose weight.  Tr. 642.

### b.  Opinion evidence

The only opinion evidence with respect to Washington's physical impairments consists of

state agency reviewing physicians' assessments.  Tr. 412-418, 506.  On April 27, 2010, Dr.

Dimitri Teague, M.D., completed a physical RFC assessment.  Tr. 412-418.   He opined that

Washington could lift 20 pounds occasionally and 10 pounds frequently.  Tr. 413.   He opined

that she could stand/walk 4 out of 8 hours in an 8 hour workday; she could sit about 6 hours in an

8 hour workday; she could only occasionally push/pull with her lower extremities; she could

never climb ladders, ropes or scaffolds; she could only occasionally climb ramps/stairs, balance,

stoop, kneel, crouch, or crawl; and she would be required to avoid exposure to all hazards

(machinery, heights, etc.).  Tr. 413-416.

On September 28, 2010, Dr. Teresita Cruz, M.D., reviewed the evidence.  Tr. 506.  She

affirmed Dr. Teague's RFC dated April 27, 2010, as written.  Tr. 506.

### C.  Testimonial evidence

### 1.  Washington's testimony

Washington was represented by counsel and testified at the administrative hearing.  Tr.

35-44, 45-47.  She indicated that she has been unable to work since 2006 or 2007 due to

depression, diabetes, fibromyalgia, and neuropathy.  Tr. 36, 37.   She has had fibromyalgia for

about a year and a half.  Tr. 40.  She has had diabetic neuropathy for about eight or nine years.

Tr. 40.  As a result of her conditions, she stated she has a tremendous amount of pain in her arms and legs.  Tr. 37.  Her pain is constant.  Tr. 41.  She has tried physical therapy and injections for her conditions.  Tr.  40.  She does not believe that she would be physically able to work now because most of her prior work involved physical labor and she is unable to lift and carry things like she used to.  Tr. 37.  She also stated that it would be hard for her to work with people because of the pain that she is in and because the medication that she takes makes her sleep most of the day.  Tr. 37.

She has used a walker for about a year but she is able to walk without her walker.  Tr. 37, 40.  However, she does use a cane and has had a cane for about four or five years.  Tr. 37, 41.  She can walk around her house okay but cannot walk long distances.  Tr. 37.  She can stand about five minutes without her cane or walker and can sit about 30 minutes but she has to constantly move or readjust herself.  Tr. 37-38, 41.  She is able to balance.  Tr. 38.  She is unable to bend, squat or stoop.  Tr. 38.  She can probably lift 5 pounds and maybe 10 pounds.  Tr. 38.  When using her cane or walker, she is unable to lift things.  Tr.  42.

Through physical therapy, she has learned some techniques that have helped her perform housework.  Tr. 38.  However, she has to perform different tasks on different days or sit down and rest.  Tr. 38.   She does some cooking.  Tr. 38.  She has special instruments that she uses to help her complete tasks around the house.  Tr.  38, 41.  For example, she has specific tools purchased through physical therapy to help her open food jars.  Tr. 41.  She is able to do some light work around the yard like planting flowers but is unable to mow the lawn or rake.  Tr. 38-39.  She enjoys playing Bingo and tries to get out to play Bingo.  Tr. 39.  On a typical day, Washington sleeps most of the day and watches movies with her kids when they get home from school.  Tr. 40.

She has gotten some relief from the medication that she takes for her diabetic neuropathy. Tr. 39.  She feels that her fibromyalgia is worse than her neuropathy.  Tr. 39.  She tried Neurontin for her fibromyalgia but is allergic to that medication as well as a second medication that her doctor prescribed for her fibromyalgia so she does not take anything for her fibromyalgia.  Tr. 39.  Her doctor was considering a different medication but Washington was waiting to see if her insurance would cover the medication.  Tr. 39-40.  She takes Percocet for pain.  Tr. 40.  She had previously taken OxyContin but was only taking Percocet at the time of the hearing.  Tr. 40.

For her psychiatric problems, Washington sees doctors twice each month and takes medication.  Tr. 42-43.  Her medication causes her to sleep most of the time.  Tr. 43.  She lacks energy and her concentration and memory are bad.  Tr.  43.  She considers herself a loner whereas in the past she considered herself to be a people person.  Tr.  43.  In May 2011, Washington had attempted suicide.  Tr. 43.  She was hospitalized for a few days.  Tr.  43.  She stated she feels worthless.  Tr. 43.  She used to be a very active person.  Tr. 44.  She was in the military and worked very physical jobs.  Tr. 44.  Now, she cannot even play with her granddaughter.  Tr. 44.  There are days that she just does not feel like getting out of bed.  Tr. 44.

### 2.      Vocational Expert's testimony

Vocational Expert ("VE") William J. Braunig testified at the hearing.  Tr. 44-50, 158. Following a few questions by the VE to Washington regarding her employment history (Tr. 45-46), the VE described Washington's past relevant work for the prior 15 years (Tr. 46-47).  The VE stated that Washington had performed work as: (1) a merchandiser, a light, semi-skilled position; (2) a trailer rental clerk, a light, semi-skilled position; and (3) a daycare worker, a light,

semi-skilled position.  Tr. 46-47.  The ALJ then proceeded to ask the VE a series of hypothetical questions.

First, the ALJ asked the VE to consider an individual who could perform light exertional work; could never climb ladders or scaffolds; could occasionally climb stairs, balance, stoop, bend, kneel, crouch, and crawl; must avoid all exposure to hazardous machinery and unprotected heights; is limited to simple and repetitive tasks in a low stress job defined as having no fixed production quotas, no hazardous positions and only occasional changes in the work setting; and occasional interaction with the public and coworkers.  Tr. 47.  The VE indicated that the described individual would be unable to perform Washington's past work because of the limitations of simple, repetitive work and occasional interaction with the public.  Tr. 47.  However, the VE also indicated that there were approximately 28,900 jobs that would be available regionally and 2.8 million nationally at the light level to the hypothetical individual, with examples including (1) office helper, with approximately 1,600 jobs available regionally and 150,000 nationally; (2) laundry worker, with approximately 845 jobs available regionally and 84,500 nationally; and (3) mail clerk, with approximately 1,000 jobs available regionally and 100,000 nationally.  Tr. 47-48.

For the second hypothetical, the ALJ asked the VE to assume the same limitations as contained in the first hypothetical except work could be performed at the sedentary, not light, level.  Tr. 48.  The VE indicated that there would be approximately 4,900 jobs available regionally and 490,000 nationally at the sedentary level, with examples including (1) tube operator, with approximately 175 jobs available regionally and 17,500 nationally; (2) microfilm document preparer, with approximately 625 jobs available regionally and 62,500 nationally; and

(3) final assembler, with approximately 1,100 jobs available regionally and 110,000 nationally. Tr. 48.

For the third hypothetical, the ALJ asked whether there would be competitive work available if an individual had a combined medical condition, associated pain, mental impairments and could not engage in sustained work activity on a regular and continuing basis. Tr. 48.  The VE indicated that there would be no competitive work for the described individual at all exertional levels.  Tr. 48.

Washington's counsel asked the VE whether there would be work available for an individual who could not stand without a walker or cane; could not sit for more than 30 minutes; and could only perform occasional handling.  Tr. 49.  The VE indicated that there would be no work available for that individual.  Tr. 49.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[15] . . . .

42 U.S.C. § 423(d)(2)(A).

---

[15] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[16] the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

---

[16] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 416.925.

## IV. The ALJ's Decision

In his February 13, 2012, decision, the ALJ made the following findings:[17]

1.      Washington had not engaged in substantial gainful activity since February 18, 2010, the application date.  Tr. 15.

2.      Washington had the following severe impairments: diabetes mellitus, obesity, and depression.  Tr. 15.  Washington's alleged fibromyalgia was not a medically determinable impairment because it had not been established by the tender-point examination signs recognized by the American College of Rheumatology ("ACR").  Tr. 15-16.

3.      Washington did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments, including Listing 12.04.  Tr. 16-17.

4.      Washington had the RFC to perform light work except that she could never climb ladders, ropes, or scaffolds and could only occasionally climb ramps and stairs.  She could occasionally balance, stoop, kneel, crouch, and crawl.  She would have to avoid all exposure to hazardous machinery and unprotected heights.  She would be limited to simple, routine, and repetitive tasks in a low stress environment defined as requiring only occasional changes in the work setting and only occasional interaction with the public.  Tr. 17-24.

5.      Washington had no past relevant work.  Tr. 24.

6.      Washington was born in 1966 and was 43 years old, which is defined as a younger individual age 18-49, on the date the application was filed. Tr.24.

7.      Washington had at least a high school education and was able to communicate in English.  Tr. 24.

8.      Transferability of job skills was not an issue because Washington had no past relevant work.  Tr. 24.

9.      Considering Washington's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Washington could perform, including office helper, laundry worker, and mail clerk.  Tr. 24-25.

---

[17] The ALJ's findings are summarized.

Based on the foregoing, the ALJ concluded that Washington had not been under a disability since February 18, 2010, the date the application was filed.  Tr. 25.

## V. Parties' Arguments

### A.    Plaintiff's arguments

Washington argues that the ALJ failed to weigh the medical opinion evidence in accordance with the Social Security's own rules and regulations.  Doc. 15, pp. 12-18; Doc. 19, pp. 1-5.  More particularly, Washington argues that the ALJ failed to properly weigh the opinion of her treating psychologist Dr. Jennifer Smirnoff, Ph.D., pursuant to the treating physician rule.  Doc. 15, pp. 12-18; Doc. 19, pp. 1-5.  She contends that the ALJ did not provide good reasons for providing little weight to Dr. Smirnoff's opinion and improperly gave more weight to the opinions of the state agency reviewing physician and one-time examining physician, who rendered their opinions in 2010, prior to the start of Dr. Smirnoff's treatment of Washington and prior to a May 2011 suicide attempt.  Doc. 15, pp. 12-18; Doc. 19, pp. 1-5.

Washington also argues that the ALJ failed to consider the record as a whole because he failed to discuss the severity of her diabetic neuropathy and its impact on her experience of pain and other symptoms.  Doc. 15, pp. 18-20; Doc. 19, pp. 5-7.

### B.    Defendant's arguments

With respect to Washington's first argument, the Commissioner argues that the ALJ properly evaluated the opinion evidence, including Dr. Smirnoff's opinion, and the ALJ's conclusions are supported by substantial evidence.  Doc. 18, pp. 13-17.  The Commissioner contends that the ALJ properly concluded and explained that Dr. Smirnoff's opinion was entitled to less than controlling weight because her opinion was internally inconsistent and that the ALJ properly noted that a GAF score of 50 was not a strong indication of disability.  Doc. 18, pp. 13-

25

15.  The Commissioner also contends that the ALJ was not required to discuss every factor in 20 C.F.R. § 416.927(c) when explaining the weight provided to the opinion of Washington's treating psychologist.  Doc. 18, pp. 15-16.  Finally, the Commissioner contends that, although Dr. Hammerly and Dr. Meyer rendered their opinions without the opportunity to review later submitted evidence, it is clear that the ALJ considered the entire record and, therefore, the ALJ did not err in providing more weight to those opinions than to the opinion of Dr. Smirnoff.  Doc. 18, pp. 16-17.

With respect to Washington's second argument, the Commissioner argues that the ALJ did in fact discuss Washington's diagnosis of neuropathy and polyneuropathy.  Doc. 18, pp. 17-19.  Thus, even though the ALJ did not specifically discuss diagnostic studies supporting Washington's diagnosis of diabetic neuropathy, the Commissioner argues that the ALJ considered the record and accounted for functional limitations that he found were supported by the record.  Doc. 18, pp. 17-19.  The Commissioner notes that Washington does not allege what specific additional functional limitations were required to adequately account for her diabetic neuropathy but argues only that she would be unable to sustain even sedentary work.  Doc. 18, p. 19.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 20)03).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

A.     **Reversal and remand is warranted for further consideration and/or discussion of the weight provided to the medical opinion evidence regarding Washington's mental health impairments**

Washington challenges the ALJ's decision to provide little weight to Dr. Smirnoff's October 20, 2011, Medical Source Statement and argues that the ALJ did not follow applicable rules and regulations when weighing the medical opinion evidence.  Doc. 15, pp. 12-18.  She argues that the ALJ's reasons for providing "little weight" to Dr. Smirnoff's opinion were not "good reasons" and the ALJ failed to consider the fact that the state agency reviewing and examining physicians, whose opinions the ALJ gave greater weight to, did not have all the evidence before them prior to rendering their decisions.  Doc. 15, pp. 13-18.

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R.

§ 404.1527(d)(2)).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  Further, when deciding the weight to be given, an ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 416.927(c).  However, while an ALJ's decision must include "good reasons" for the weight provided, the ALJ is not obliged to provide "an exhaustive factor-by-factor analysis."  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

There is no categorical requirement that a non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record.'"  *Helm v. Comm'r of Soc. Sec.*, 405 Fed. Appx. 997, 1002 (6th Cir. 2011).  Additionally, an ALJ's decision to provide greater weight to a state agency opinion over that of a treating source is not alone a basis for reversal and remand.  *Blakely,* 581 F.3d at 409.  However, under the treating physician rule, generally a treating source opinion is entitled to greater deference than opinions of non-treating physicians.  *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009).  Further, before an ALJ gives greater weight to a state agency physician's opinion than to that of a treating source where the state agency physician's opinion is not based on a review of the complete record, there should be some indication that the ALJ considered the fact that the state agency physician had not reviewed all the evidence.  *Blakely,* 581 F.3d at 409 (recognizing that a situation where it may be

appropriate for an ALJ to afford more weight to the opinion of a state agency opinion than that of a treating source is "when the '[s]tate agency medical . . . consultant's opinion is based on a review of a complete case record that . . . provides more detailed and comprehensive information than what was available to the individual's treating source.'") (quoting Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996)); *see also Stacey v. Comm'r of Soc. Sec.*, 451 Fed. Appx. 517, 518 (6th Cir. 2011) (indicating that, in *Blakely*, the court "remanded the case . . . in part because the ALJ's opinion gave 'no indication' that he 'at least considered' that the state agency physician had not reviewed all the evidence in record before giving his opinion significant weight.").

Here, the ALJ gave "little weight" to Dr. Smirnoff's opinion, "some weight" to state agency examining psychologist Dr. Hammerly's opinion, and "great weight" to the opinions of the two state agency reviewing psychologists. Tr. 23. In explaining the weight provided to Dr. Smirnoff's opinion, the ALJ stated,

> Dr. Jennifer Smirnoff opined on October 20, 2011 that the claimant's depression would cause the claimant to become easily overwhelmed and/or miss work altogether (Ex. 27F). She stated that the claimant would have difficulty tolerating the stress of routine, unskilled or low-skilled work and would require frequent absences or breaks interfering with work productivity. However, she also indicated that the claimant would only be absent, late, or leave early one to three times per month. She further opined that the claimant can tolerate superficial interactions with co-workers or the public up to one third of the workday and her symptoms would cause her to be 25% less productive than an unimpaired worker due to decreased energy and motivation. This is compared to her opinion in the same report that the claimant can understand, remember and follow directions for simple tasks at least 80% of the time and can stay on task at least 80% of the time (Ex. 27F). Dr. Smirnoff's opinion is given little weight because it is internally inconsistent. Additionally, her treatment records indicate she gave the claimant a Global Assessment of Functioning (GAF) score of 50 (Ex. 25F, pp. 26-27). While GAF ratings of 41-50 reflect "serious" impairment in social, occupational, or school functioning (American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders – Fourth Edition (1994)), the U.S. Court of Appeals for the Sixth Circuit has indicated that a GAF of 50 is consistent with the ability to work (*Smith v. Comm'r of Soc. Sec.* 482 F.3d 873, 877 (6th Cir. 2007)).

Tr. 23.

With respect to the opinion of the consultative examining psychologist, the ALJ stated

that he was providing "some weight" to Dr. Hammerly's opinion because it was "consistent with

his objective observations of the claimant during a detailed psychological evaluation."  Tr. 23.

With respect to the opinions of the state agency reviewing psychologists, the ALJ stated that he

was providing "great weight" to those opinions because the state agency psychologists had

"reviewed the record and have specialized knowledge in assessing findings within the Social

Security Standard."  Tr. 23.

As reflected in the ALJ's decision, the ALJ provided a basis for providing "little weight"

to Washington's treating source's opinion, i.e., he found Dr. Smirnoff's opinion to be internally

inconsistent and unsupported by treatment records indicating that Dr. Smirnoff had assigned a

GAF score of 50.  Tr. 23.  Consistency and supportability are factors under 20 C.F.R. 416.927(c)

to be considered when determining the weight to be provided to a treating source's opinion and

an ALJ is not required to provide an exhaustive factor-by-factor analysis of all the factors.  *See*

*Francis*, 414 Fed. Appx. at 804.  However, here the ALJ's discussion of the weight provided to

Dr. Smirnoff's opinion falls short of affording the Court a basis to conduct a meaningful review

of the ALJ's decision.

The ALJ did not discuss the consistency of Dr. Smirnoff's opinion with the other

evidence of record.  Further, although he provided "great weight" to the state agency reviewing

psychologists' opinions and "some weight" to the state consultative examining psychologist's

opinion, the ALJ also did not discuss the consistency of those opinions with the evidence of

record.  Moreover, all three of the state agency psychologists rendered their opinions in 2010,

prior to any treatment by Dr. Smirnoff and prior to Washington's May 2011 hospitalization for attempted suicide.

The Commissioner suggests that, because the ALJ's decision demonstrates that the ALJ considered the entire record, the ALJ properly gave "great weight" and "some weight" to the state agency psychologists' opinions even though they rendered their opinions without having reviewed or considered the entire record, including Dr. Smirnoff's treatment of Washington and Washington's May 2011 hospitalization. Doc. 18, pp. 16-17. While the ALJ did consider evidence not considered by the state agency psychologists (Tr. 21.), one of the ALJ's two reasons for giving "great weight" to the opinions of the state agency reviewing psychologists was that they had "reviewed the record." Tr. 23. Yet, the ALJ failed to acknowledge that all three of the state agency psychologists rendered their opinions in 2010, prior to any treatment by Dr. Smirnoff and prior to Washington's May 2011 hospitalization for attempted suicide and that Dr. Smirnoff's opinion was based on a more complete record.

Further, Dr. Meyer, in rendering his opinion to which the ALJ gave great weight, considered the fact that there had been no in-patient hospitalizations. Tr. 436. Also, Dr. Haskins, the other state agency reviewing psychologist to whom the ALJ gave great weight, noted that there had been no further "psych treatment" reported. Tr. 505. The foregoing notes highlight why the ALJ's failure to more fully explain how he weighed Dr. Smirnoff's opinion and the opinions of the state agency psychologists in light of the 2011 records that were not available to the state agency psychologists but were available to Dr. Smirnoff prevents this Court from conducting a meaningful review of the decision to determine whether it is supported by substantial evidence.

The only other basis stated by the ALJ for providing "great weight" to the state agency reviewing psychologists' opinions was that they had "specialized knowledge in assessing findings within the Social Security Standard." Tr. 23.   While specialization is a factor to consider when weighing medical opinions, the ALJ did not make clear how the evidence not considered by the state agency psychologists was considered when weighing the medical opinion evidence.  For example, the ALJ noted that Washington's treatment records reflected some improvement following Washington's discharge from her May 2011 hospitalization but he also noted records showing that Washington was continuing to have difficulty, i.e., feeling no happiness or joy and irritability and isolation. Tr. 21.  Yet, as noted above, when weighing the medical opinions regarding Washington's mental health impairments, the ALJ did not mention whether or how the opinion evidence was or was not consistent with the other evidence of record.

Without a more thorough discussion by the ALJ with respect to how the evidence not considered by the state agency psychologists was factored into the weight the ALJ provided to their and Dr. Smirnoff's opinions, the Court is unable to conduct a meaningful review of the ALJ's decision to determine whether the weight provided to the medical opinion evidence is supported by substantial evidence.  *See Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007) (when assessing whether the treating physician rule had been adhered to, the court took note of the ALJ's failure to acknowledge that state reviewing physicians had not considered evidence that had been taken into account by a treating source); *see also Blakely*, 581 F.3d at 409 (relying in part on *Fisk* when evaluating whether the ALJ had properly weighed the opinions of state agency reviewing physicians who had not considered later rendered assessments and treatment

records); *see also see also Stacey*, 451 Fed. Appx. at  518 (relying on *Blakely*).  Accordingly, reversal and remand is warranted for further proceedings consistent with this Opinion.

**B.      The ALJ did not err with respect to his consideration of evidence regarding Washington's diabetic neuropathy**

Washington also argues that the ALJ erred because he failed to consider all relevant evidence. In particular, she argues that, while the ALJ mentioned her diabetic neuropathy, he made no mention of an EMG of the upper and lower extremities from April 28, 2009, which showed mixed motor and sensory neuropathy.  Doc. 15, pp. 18-20; Tr. 354, 381-382.  Thus, she argues that the ALJ did not properly discuss the severity of her diabetic neuropathy or its effect on her pain or other symptoms. Doc. 15, pp. 18-20.

Although the ALJ did not specifically discuss the April 28, 2009, EMG test results, the ALJ acknowledged that Washington was claiming disability based on diabetic neuropathy (Tr. 18) and that Washington had received diagnoses of neuropathy (Tr. 19).  For example, the ALJ discussed Dr. Linares' March 15, 2010, diagnosis of chronic neuropathy and a May 9, 2010, hospital discharge diagnosis of diabetic neuropathy.  Tr. 19, 490, 546.  Further, the ALJ considered and weighed the opinion of state agency reviewing physician Dr. Teague who opined as to Washington's physical RFC.[18]  Tr. 22, 412-419.  In rendering his opinion, Dr. Teague noted and considered the EMG which showed mixed sensory neuropathy with no signs of myopathy, myositis, or radiculopathy.  Tr. 414.  The ALJ gave some weight to Dr. Teague's opinion but concluded that, based on evidence received at the hearing level which showed that Washington had painless full range of motion in her lumbar spine and 5/5 muscle strength, Washington's physical capacities were slightly greater than as assessed by Dr. Teague.  Tr. 22-23.  Thus, the

---

[18] As noted by the ALJ, on September 28, 2010, Dr. Cruz affirmed Dr. Teague's opinion as written.  Tr. 22, 506.

ALJ concluded that Washington could stand/walk up to 6 hours in an 8 hour day as opposed to 4 hours as opined by Dr. Teague.[19]  Tr. 22-23.

The foregoing demonstrates that the ALJ considered Washington's alleged impairments and medical evidence relating thereto, including her diabetic neuropathy. Tr. 13-25.  Further, although the ALJ did not specifically reference the EMG in his opinion, the EMG was contained in the record (Tr. 381-382) and was referred to by Dr. Teague in his opinion (Tr. 414) which the ALJ discussed and weighed (Tr. 22-23).   Additionally, during the administrative hearing, Washington indicated that she was taking medication for her diabetic neuropathy which provided her relief and she thought her fibromyalgia had taken over more than her neuropathy. Tr. 39. Moreover, Washington has not presented opinion evidence from a treating source that identifies functional limitations resulting from her diabetic neuropathy.  Tr. 22 (ALJ decision noting that there was no treating physician opinion relating to Washington's physical impairments).

Accordingly, the Court finds no error with respect to the ALJ's consideration of Washington's allegations regarding her diabetic neuropathy or the evidence relating thereto.

## VII. Conclusion

For the reasons set forth herein, the Court **REVERSES and REMANDS** the Commissioner's decision for further proceedings consistent with this Opinion.[20]

Dated:  September 8, 2014

_____
Kathleen B. Burke
United States Magistrate Judge

---

[19] Washington does not assert as error a claim that the ALJ improperly considered or weighed Dr. Teague's opinion.

[20] This opinion should not be construed as requiring a determination on remand that Washington is disabled.